UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLIVIA U. TORRES,<br><br>        Plaintiff,<br><br>  v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>        Defendant.<br>_____/ | No. C 08-1940 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Defendant's Motion for Partial Summary Judgment and Defendant's Motion for Judgment on the Pleadings** |

      Plaintiff Olivia U. Torres ("Torres") brought suit against defendant Unum Life Insurance Company of America ("Unum"), alleging numerous causes of action in tort and contract, in connection with defendant's denial of plaintiff's long-term disability ("LTD") claim. Now before the court is Unum's motion for partial summary judgment or adjudication of issues with respect to the first, second, fourth, and sixth claims for relief, as well as Unum's motion for judgment on the pleadings with respect to the fourth, fifth, and sixth claims for relief. The court has considered the parties' arguments, and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

      Plaintiff was a departmental secretary for the Chief of Police of the City of Alameda. Joint Statement of Undisputed Facts ("JSUF") ¶ 1. She was insured under a non-contributory group disability group insurance policy issued by Unum to the City of Alameda. Id. ¶ 2. Because the plan is a governmental plan, it is exempt from the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. Section 1134, and is governed by California law. Id. ¶ 3. On October 31, 2002, plaintiff ceased work, due to major depression, irritable bowel syndrome, asthma, hypertension, and breast cancer. See id. ¶ 4; Codiga Dec., Exh. 3. Plaintiff's subsequent LTD claim was approved effective January 29, 2003. JSUF ¶ 5. Unum paid plaintiff's LTD claim until September 4, 2003, when upon investigation, Unum determined that she no longer satisfied the policy definition of disability. Id. ¶ 6; Codiga Dec., Exh. 3.

Plaintiff submitted an appeal on March 2, 2004, requesting more time to provide additional information to support her claim of ongoing disability. JSUF ¶ 7; Codiga Dec., Exh. 3. Unum granted plaintiff a forty-five-day extension to April 16, 2004, and received additional records from plaintiff on April 15, 2004. JSUF ¶¶ 8-9. Based on the information it received, Unum notified plaintiff in a July 30, 2004 letter that her benefits would be extended to November 19, 2003. JSUF ¶ 10; Codiga Dec., Exh. 3. That letter indicated that if plaintiff had additional medical records to support her claim of ongoing disability, she could provide them by August 30, 2004 or her claim would remain closed. JSUF ¶ 12-13; Codiga Dec., Exh. 3. Unum did not receive any additional records from plaintiff; thus, plaintiff received notice of the denial of her claim on or about July 30, 2004. JSUF ¶ 14. Plaintiff was issued a lump sum payment for the period of time from September 5, 2003 through November 19, 2003. Codiga Dec., Exh. 3.

Around this same time period, beginning in September 2003, Unum and other subsidiaries of UnumProvident Corporation became the subject of a nationwide market conduct examination by state insurance regulators, who sought to determine whether the companies used unfair claim settlement practices. Griffin Dec., Exh. 1 at 1-2. Contemporaneously, the United States Department of Labor conducted an investigation of the companies pursuant to ERISA. Id. As a result of both investigations, UnumProvident was fined $15 million and its companies agreed to implement a corrective plan of action set forth in a Regulatory Settlement Agreement ("RSA"). Id. at 2-3. The RSA's official implementation date was January 19, 2005. Codiga Dec., Exh. 2.

Relevant to the instant action is the RSA's requirement that Unum offer reassessment of any claims that were denied or benefits that were terminated on or after January 1, 2000, which includes plaintiff's claim denial. JSUF ¶ 15; Griffin Dec., Exh. 1 at 10. The RSA's "Claim Reassessment

2

1 Process" required Unum to form a "Claim Reassessment Unit" to handle the reassessments and to
2 mail notices to all eligible claimants. Griffin Dec., Exh. 1 at 9-10. The RSA provided that any
3 applicable statutes of limitations would be tolled during the pendency of the reassessment process.
4 JSUF ¶ 16; Griffin Dec., Exh. 1 at 14. Plaintiff opted into the reassessment process on September
5 22, 2005. JSUF ¶ 17; Griffin Dec., Exh. 2 at 16. Unum acknowledged receipt of plaintiff's election
6 to participate in the reassessment in an October 11, 2005 letter. Griffin Dec., Exh. 2 at 23.

7      A year later, Unum notified plaintiff in an October 19, 2006 letter that it was ready to begin
8 the reassessment of her claim and enclosed for her completion an eight-page Reassessment
9 Information Form to be submitted within sixty days. Griffin Dec., Exh. 2 at 28-38. The letter also
10 gave plaintiff the option of submitting within sixty days a request for additional time to complete the
11 form. Id. at 28. The Reassessment Information Form required plaintiff to provide personal,
12 employment, medical, and financial information. Id. It also included a "Conditional Waiver and
13 Release" which stated, "any applicable statute of limitations is tolled during the pendency of the
14 reassessment of my claim; however, I understand that my participation in the Claim Reassessment
15 Process will not revive or reinitiate the statute of limitations with respect to the previous claim
16 decision." Id. at 37. Plaintiff failed to send the form to Unum, or request an extension of time to do
17 so within the sixty-day deadline. On January 17, 2007, plaintiff sent a letter to Unum requesting an
18 extension to file the form because she had been in the process of moving in December 2006. Id. at
19 8. In a January 18, 2007 letter, Unum denied plaintiff's request for an extension as untimely and
20 advised her that she was therefore no longer eligible to participate in the reassessment process. Id. at
21 14.

22      Plaintiff filed suit against Unum over a year later on April 11, 2008, alleging three causes of
23 action: breach of the implied covenant of good faith and fair dealing ("bad faith"), intentional
24 infliction of emotional distress ("IIED"), and breach of contract. See Compl., Docket No. 1. The
25 parties engaged in unsuccessful settlement negotiations in July 2008. Plaintiff then amended her
26 complaint by stipulation to include three more claims of relief arising out of the settlement
27 discussions: the fourth cause of action for bad faith, the fifth cause of action for violation of the
28

3

Unruh Civil Rights Act, and the sixth cause of action for IIED. See Amended Compl., Docket No. 20.

Unum now moves for partial summary judgment as to the first, second, fourth, and sixth claims (the bad faith and IIED claims), based on the two-year tort statutes of limitations. Unum also moves for a judgment on the pleadings as to the fourth, fifth, and sixth claims (bad faith, violation of the Unruh Civil Rights Act and IIED), based on the July 2008 settlement negotiations and a specific non-monetary term that plaintiff allegedly rejected.

LEGAL STANDARDS

I.   Summary Judgment

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the proceedings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Anderson, 477 U.S. at 249; Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

4

II.     Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that after the pleadings are closed but without causing delay to trial, parties may move for judgment on the pleadings. "A judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." McGann v. Ernst & Young, 102 F.3d 390, 392 (9th Cir.1996). The essence of analysis under Rule 12(c) is "to determine whether, if the facts were as pleaded, they would entitle the plaintiff to a remedy." Int'l Technologies Consultants, Inc., v. Pilkington PLC, 137 F.3d 1382, 1384 (9th Cir. 1998).

DISCUSSION

I.     Defendant's Motion for Partial Summary Judgment (Claims 1, 2, 4, and 6)

    A.     The Statute of Limitations

In its motion for partial summary judgment, defendant argues that the statute of limitations has run on plaintiff's tort claims, which encompass the first, second, fourth, and sixth claims. Plaintiff's first and fourth causes of action allege that Unum breached the implied covenant of good faith and fair dealing (i.e., bad faith) through arbitrary termination of plaintiff's LTD benefits and attempts to settle this action on improper terms. In California, the statute of limitations for bad faith claims is two years. See Cal. Code of Civ. Proc. § 339.1; see also, Smyth v. USAA Propr. & Cas. Ins. Co., 7 Cal. Rptr. 2d 694, 698 (1992). In insurance cases, the statute of limitations accrues upon the insurer's "unconditional denial" of benefits. See Love v. Fire Ins. Exchange, 221 Cal. App. 3d 1136, 1143 (1990). Plaintiff's second and sixth causes of action allege IIED based on Unum's initial denial of her benefits and later denial of her reassessment request. The statute of limitations for IIED is also two years. See Cal. Code of Civ. Proc. § 335.1.

The parties agree that the statute of limitations for both the bad faith and IIED claims is two years. Moreover, the parties do not differentiate between the start of the statute of limitations for the bad faith and IIED claims; in other words, they treat all tort claims as accruing from the same date—the day when plaintiff's ongoing disability claim was denied. The parties disagree over the exact date on which this occurred.

5

Defendant argues that the statute of limitations on plaintiff's tort claims began to accrue on July 30, 2004, the date of defendant's letter advising plaintiff that her benefits would only be paid through November 19, 2003. Plaintiff contends that the July 30, 2004 letter is not an "unconditional denial" of benefits which would trigger the statute of limitations because it allowed plaintiff additional time to submit more medical records.

The court agrees with defendant and finds that the July 30, 2004 letter constitutes an unconditional denial of plaintiff's LTD coverage for purposes of the statute of limitations. Plaintiff was notified through that letter that her final payment would reflect a time period ending on November 19, 2003. Moreover, she has not received payments for any time period after that date. The letter also states,

> we have determined that your client can perform her occupation as of November 20, 2003 and, therefore, *the decision to deny the claim as of that date is appropriate*.
>
> . . .we understand that you or your client may have additional medical records to support her ongoing disability. . .If we do not receive these records by August 30, 2004, your client's claim *will remain closed.*"

Codiga Dec., Exh. 3 (emphasis added).

Thus, the letter explicitly notifies plaintiff that she would no longer receive payments for any time period after November 19, 2003. The letter also makes clear that unless additional medical records were sent to defendant by August 30, 2004, plaintiff's claim would "remain closed." It is established in California that "[a] statement of willingness to reconsider does not render a denial equivocal." Migliore v. Mid-Century Insurance Co., 118 Cal. Rptr. 2d 548, 606 (2002) (citation omitted). An insurer does not even have to use the words "deny" or "denial" for a denial to be unconditional. Id. The July 30, 2004 denial letter established that plaintiff's claim was closed as of that date and that there was a possibility of reopening it if she timely submitted more medical records. She did not. Thus, her claim was denied as of July 30, 2004.

The court finds unavailing plaintiff's argument that the statute of limitations began running on November 23, 2004, based on an October 19, 2006 letter in which defendant mistakenly states that "[plaintiff's] claim was closed or terminated on 11/23/2004." See Codiga Dec., Exh. 4. November 23, 2004 does not correspond to any dates otherwise recorded in this matter and, according to defendant, it was written in error or referenced an internal file closure date. Plaintiff

6

1  has failed to provide any plausible rationale as to why it would represent the legitimate termination
2  date. Rather, plaintiff's counsel has explicitly acknowledged in correspondence with defendant that
3  "[plaintiff's] benefits were terminated effective November 19, 2003." See Griffin Dec., Exh. 2 at 16
4  (September 22, 2005 letter from plaintiff's counsel to Unum). The court rejects plaintiff's attempt to
5  begin the statute of limitations on a date which she clearly knows is wholly unsupported by the
6  record. Plaintiff's claims for bad faith and IIED are barred, therefore, if she did not file her initial
7  complaint for damages within two years of July 30, 2004, less any period of tolling.

B. The Tolling Period

The parties dispute the exact date on which the tolling period began under the RSA, although they both agree that it ended on January 18, 2007, when Unum notified plaintiff that she was no longer eligible for reassessment. The disagreement between plaintiff and defendant turns upon the interpretation of section B.2.d of the RSA, which states that "any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process." See Griffin Dec., Exh. 1 at 14. Plaintiff argues for a broad interpretation of the "Claim Reassessment Process" which would begin tolling as early as the day the RSA was enacted, while defendant prefers a narrower reading that would begin tolling on the day plaintiff opted into her particular reassessment.

Specifically, defendant argues that the tolling period began on September 22, 2005, when plaintiff opted into the reassessment process by formal letter from her attorney. Plaintiff proposes different dates on which the tolling may have started: November 18, 2004, the date when Unum signed the RSA; February 9, 2005, the date by which Unum was required to mail notices to eligible claimants; or February 18, 2005, the date by which Unum was required to form a "Claims Reassessment Unit" to handle review of the reassessment claims.

The court finds that the tolling period appropriately began on September 22, 2005, when plaintiff opted into the reassessment. Any ambiguity as to the start of the tolling period was resolved by the October 19, 2006 letter from Unum, which included a "Conditional Waiver and Release" to be signed by plaintiff that specifically stated, "any applicable statute of limitations tolled during the pendency of the reassessment of my claim." Griffin Dec., Exh. 2 at 37. This made it explicit to plaintiff that her claims would only be tolled during the reassessment of her particular claim.

7

Notably, tolling from September 22, 2005 in no way prejudiced plaintiff's ability to bring forth the instant action in a timely manner. Plaintiff's September 22, 2005 letter opting into reassessment was written approximately a year and two months after her July 30, 2004 claim denial. Plaintiff thus opted into the reassessment process when she had about ten months remaining on the two-year limitations period. By opting into reassessment and its tolling provision then, she preserved her right to sue within approximately ten months of receiving a reassessment decision. However, plaintiff failed to timely exercise her right once her reassessment was denied on January 18, 2007. Instead, plaintiff waited over a year and three months to bring her suit on April 11, 2008.

Plaintiff's proposed tolling dates are flawed because they focus on dates of actions taken by defendant, when they should focus on actions taken by the plaintiff as claimant. Plaintiff urges the court to turn a blind eye to her failure to meet deadlines by alleging that defendant itself failed to timely send her notice of the Claim Reassessment Process. The RSA required Unum to provide initial notice to Specified Claimants of the Claim Reassessment Process no later than the fifteenth business day following January 19, 2005, the RSA's official Implementation Date. See RSA B.2.b, Griffin Dec., Exh. 1 at 10; Codiga Dec., Exh. 2. This meant that Unum was required to send notices to eligible claimants by February 9, 2005. Unum did not send plaintiff her notice until June 21, 2005.[1] Plaintiff argues that this is evidence of Unum's dilatoriness which, taken to the extreme, would have deprived her of notice long enough such that she would have opted into the Claim Reassessment Process after the statutes of limitations had run on her claims. Thus, plaintiff contends that fairness considerations militate in favor of starting the tolling period on or around the date that the RSA was enacted.

The court is not persuaded by this argument, which paints an incomplete picture of the RSA and its relationship to California claimants. California was one of two states which declined to sign the RSA in November 2004 and instead came to an independent agreement, the California Settlement Agreement ("CSA"), with Unum on October 3, 2005. See CSA III.[2] Although California was not an official party to the RSA, California claimants were still eligible for reassessment and many, like plaintiff, received reassessment notices before the CSA was signed. Id. at III.A. The CSA required Unum to send notice to and receive reassessment requests from eligible California

8

1  claimants who had not yet elected to participate in the RSA Reassessment by the CSA's
2  Implementation Date of approximately November 1, 2005. Id. at III.B.2; CSA Exh. C.  The RSA
3  was amended accordingly, such that the RSA's notice provision would "not apply to such claimants
4  residing in any state that has not joined the RSA and that has a separate settlement agreement with
5  the Companies addressing the notice issue for claimants in that state." See Amendment to
6  Regulatory Settlement Agreement.[3]  Moreover, any California claimants, like plaintiff, who had
7  already opted into the RSA would have their reassessments performed under the rules and
8  procedures set forth in the CSA, not the RSA. See CSA III.A.  Thus, the RSA's Implementation
9  Date of January 19, 2005 and its accompanying notice deadlines, no longer had any bearing on
10 plaintiff's reassessment once the CSA was signed. See RSA B.2.b, Griffin Dec., Exh. 1 at 10;
11 Codiga Dec., Exh. 2.  In fact, plaintiff received her notice *early* by CSA standards, negating
12 plaintiff's allegation of dilatoriness on Unum's part.  Even if plaintiff had received notice of
13 reassessment and started the tolling period as late as November 2005, she still would have had
14 several months to bring her suit after her reassessment denial.

15         The court similarly rejects plaintiff's attempt at oral argument to take terms such as "Claim
16 Reassessment Process" out of the larger context of the RSA.  As previously discussed, section B.2.d
17 of the RSA states that "any applicable statutes of limitations shall be tolled during the pendency of
18 the Claim Reassessment Process." See Griffin Dec., Exh. 1 at 14.  Plaintiff contends that "Claim
19 Reassessment Process" refers not to claimants' individual reassessments, but to the general
20 procedures set forth in the RSA, which became effective on or around the RSA's Implementation
21 Date of January 19, 2005. Plaintiff's position is untenable because the RSA makes clear that the
22 reassessment process is "entirely optional," RSA B.2.d., and is replete with language that indicates
23 that each eligible claimant must take affirmative steps to enroll into the Claim Reassessment
24 Process. Griffin Dec., Exh. 1 at 13; see also RSA B.2.b, Griffin Dec., Exh. 1 at 10 (notices must be
25 sent to specified claimants "advising that they may resubmit their claim for further review"); RSA
26 B.2.b.1, Griffin Dec., Exh. 1 at 11 (the reassessment process "will be available" to those "who elect
27 to participate"); RSA B.2.b.3, Griffin Dec., Exh. 1 at 11 (Unum must notify claimants "how to
28 communicate . . . election to participate" and must send "[acknowledgments] of their election to

9

participate"). Thus, plaintiff and those similarly situated could only partake in the reassessment process and benefit from its tolling provisions once they had personally elected to participate, not when the Claim Reassessment Process was implemented in general.

Plaintiff contends that the RSA should be analogized to a class action suit such that the pendency of the reassessment process as to all claimants tolled the statute of limitations for any individual claimant. The court declines to apply class action principles to the RSA, which is essentially a contract among Unum, state insurance regulators, the Department of Labor, and eligible claimants who opted into reassessment. The court also finds unconvincing plaintiff's argument that the sixty-day time period provided by defendant to complete the Reassessment Information Form was unreasonable. Either the form *or* a request for an extension to complete the form, was due within sixty days. Plaintiff failed to submit either. Moreover, notice was given to plaintiff in the original October 11, 2005 letter acknowledging receipt of plaintiff's election to participate in the reassessment that, when reassessment began, plaintiff would have sixty days to submit an information form. Thus, in effect, plaintiff had over a year's notice that action would need to be taken at some date in the future within two months. The court does not find this unreasonable.

Thus, the statute of limitations started to run on July 30, 2004 and was tolled during plaintiff's claim reassessment process, which took place between September 22, 2005 and January 18, 2007. Taking into account these dates and the tolling period, a total of two years and 136 days has elapsed from the date of notice of plaintiff's claim denial to the date that plaintiff filed this suit. The court therefore GRANTS defendant's motion for partial summary judgment as to the first and second claims for relief, as they relate entirely to the July 30, 2004 claim denial as well as the fourth and sixth claims for relief, to the extent that they relate to the July 30, 2004 claim denial.

However, the court DENIES in part defendant's motion for summary judgment as to the fourth and sixth claims for relief to the extent that they relate to the July 2008 settlement negotiations because the two-year statutes of limitations have not yet run on those claims. Defendant's argument that the fourth and sixth claims are barred because they relate to confidential settlement negotiations is addressed in the following section.

10

1  II.     Defendant's Motion for Judgment on the Pleadings (Claims, 4, 5, and 6)

2         Plaintiff's fourth, fifth, and sixth claims for bad faith, violation of the Unruh Civil Rights
3  Act, and IIED, respectively, are based upon unsuccessful settlement negotiations from July 2008 and
4  a specific non-monetary term that plaintiff rejected. Defendant contends that these three claims for
5  relief are premised upon hypothetical relief, based on what would have happened if plaintiff had
6  accepted the terms of a proposed settlement agreement, which she did not.

7         Specifically, defendant argues that (1) the fifth claim is not ripe for adjudication and plaintiff
8  lacks standing because it alleges a hypothetical future violation of the Unruh Act, and (2) that the
9  fourth, fifth, and sixth claims necessarily fail because they are based upon inadmissible settlement
10 communications under Federal Rule of Evidence 408 and privileged litigation statements under
11 California Civil Code Section 47(b). Each of these arguments will be discussed in turn.

12    A.     Violation of the Unruh Civil Rights Act (Claim 5)

13        Plaintiff's fifth claim alleges a violation of California's Unruh Civil Rights Act, California
14 Civil Code section 51 et seq. ("Unruh Act"). The Unruh Act provides:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability, or medical condition* are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b) (emphasis added).

The Act also provides that,

> No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state because of the race, creed, religion, color, national origin, sex, *disability, or medical condition* of the person…

22 Id. at 51.5(a) (emphasis added).

23        "The Unruh Civil Rights Act works to ensure that all persons receive the full
24 accommodations of any business within California, regardless of the person's disabilities."
25 Goldman v. Standard Ins. Co., 341 F.3d 1023, 1027 (9th Cir. 2003) (citation omitted). The
26 insurance business is subject to the Unruh Act. See Cal. Ins. Code § 1861.03(a). An insurance
27 company's refusal to provide coverage on the basis of disability, or to provide disparate treatment
28 and pricing in coverage on such basis, may constitute a violation if the discrimination is

11

1  unreasonable.  See Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1050 (9th Cir. 2000)
2  (noting that certain types of pricing differentials in coverage that are reasonable and therefore not
3  arbitrary may not violate the Unruh Act).

4        Plaintiff alleges that defendant violated the Unruh Act during settlement negotiations by
5  mandating certain non-monetary conditions in the release that plaintiff considers against public
6  policy.  Specifically, plaintiff asserts that the terms of defendant's proposed settlement, were they to
7  have been accepted by plaintiff, would have lead to an illegal boycott of and a refusal to do future
8  business with plaintiff based on her cancer and related mental condition.[4]  Plaintiff essentially argues
9  that although defendant's alleged discrimination was merely proposed and not actual, it nonetheless
10 constituted a violation of the Unruh Act.  Plaintiff contends that defendant conditioned its agreement
11 to pay the money it owed plaintiff on her agreement to be the victim of discrimination and the loss of
12 money constitutes a current injury.  Plaintiff's claim for relief includes an injunction prohibiting
13 defendant from inserting the allegedly violative terms in its release and settlement agreements.

14       Defendant argues that plaintiff has not suffered an actual injury that would give her standing
15 to sue.  Since plaintiff rejected the terms of the settlement offered, defendant contends that none of
16 the hypothetical violations plaintiff alleges could come to pass.  Moreover, defendant argues that the
17 relief plaintiff seeks would not necessarily remedy her alleged injury because defendant could
18 simply choose not to settle with her.

19       Article III of the United States Constitution confines the federal courts to adjudicating actual
20 "cases and controversies" and requires a litigant to have standing to invoke the power of the federal
21 court.  Allen v. Wright, 468 U.S. 737, 750 (1984).  The doctrine of standing is comprised of both
22 constitutional requirements and prudential considerations.  Hartman v. Summers, 120 F.3d 157, 159
23 (9th Cir. 1997).  Constitutional standing generally requires a showing of three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical'". . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted).

12

1 The party invoking federal jurisdiction bears the burden of establishing those elements. Id. at
2 561. Moreover, the Ninth Circuit has held: "To meet this burden at the summary judgment stage,
3 [the plaintiff] 'must set forth by affidavit or other evidence specific facts' supporting each element."
4 S.D. Myers, Inc. v. City and County of San Francisco, 253 F.3d 461, 474 (9th Cir. 2001) (citing
5 Lujan, 504 U.S. at 561).

6 As to the first element, plaintiff has not demonstrated that she has suffered an "actual or
7 imminent" injury. See Lujan, 504 U.S. at 555. "To confer standing, the threat of future injury must
8 be credible rather than remote or hypothetical." Hartman, 120 F.3d at 160 (citation omitted). A
9 plaintiff must show "a very significant possibility that the future harm will ensue." Id. (citation
10 omitted). The Supreme Court in Lujan held that plaintiffs did not have standing because they did
11 not suffer an "injury in fact." 504 U.S. at 564. The Court found that plaintiffs' assertion that harm
12 could occur at some indefinite point in the future was insufficient because "[s]uch 'some day
13 intentions'—without any description of concrete plans, or indeed even any specification of when the
14 some day will be—do not support a finding of 'actual or imminent' injury that our cases require."
15 Id. Using this line of reasoning in Hartman, the Ninth Circuit found that a habeas petitioner had not
16 yet suffered a harm under the release statute he challenged as unconstitutional, because he had not
17 yet filed or demonstrated an intention to file an application for release under that statute. 120 F.3d at
18 160. Thus, notwithstanding that the statute could well be unconstitutional, the court declined to
19 grant standing. Id.

20 Similarly, in the instant action, although the settlement terms offered by defendant
21 purportedly lead to future violations the Unruh Act, the court must decline to grant plaintiff
22 standing. Plaintiff acknowledges that her harm would only be realized through a series of
23 hypothetical events: She would first have to sign the settlement agreement, apply for insurance from
24 defendant, and then be rejected by defendant based on discrimination that specifically violates the
25 Unruh Act. Furthermore, plaintiff has not even asserted that she would in fact seek insurance
26 coverage from Unum again, nor has she demonstrated that Unum would reject such a request by
27 specifically violating the Unruh Act. The uncertainty that lies in possible future violations of the
28 Unruh Act thus precludes plaintiff's conjectural injury from being an actual injury.

13

Although plaintiff originally asserted that defendant's violation of the Unruh Act would only occur if she accepted the settlement agreement, she additionally contends in her opposition that a violation has already occurred. Specifically, plaintiff argues that she has been injured by defendant's failure to pay her ongoing disability claim, which has allegedly been withheld because plaintiff will not agree to Unum's future violation of the Unruh Act. Plaintiff is inconsistent in her arguments and often conflates her breach of contract claim with her claims sounding in tort. The court remarks upon plaintiff's delicate word smithing, in arguing that the payment of monies due on her claim is both an "advantage" under the Unruh Act, to which she is entitled to her full and equal extent, and a present "claim" upon which she is entitled to collect under the terms of her insurance. Whether a contractual obligation can be linked with an advantage under the Act is not something for the court to address, given that matter is not essential to the holding. However, for future reference, the court advises the parties that clear arguments facilitate matters and arguments pled in the alternative are stronger if they are so noted.

Notwithstanding this point, plaintiff has failed to plead that the cause of her actual pecuniary injury is defendant's current discrimination based on her disability, which would be required to constitute a violation of the Unruh Act. Instead, plaintiff again relies upon a hypothetical future violation of the Unruh Act as the cause of her inability or unwillingness to accept settlement and to thus recoup any payment/claim/advantage that defendant may owe her. Thus, plaintiff continues to lack standing to bring her Unruh Act claims based on the proposed settlement terms.

The court further finds that, as to the second element of standing, plaintiff is not able to prove any kind of causation between her future injury and defendant's future illegal conduct precisely because such conduct is completely conjectural. The court also finds that plaintiff has failed to meet her burden of proving that a favorable outcome as to her Unruh claim would redress her harm. Even if the court were to order defendant to rework its settlement agreement, defendant could easily refuse to settle with plaintiff. The court rejects plaintiff's claim that settlement may be mandatory in the context of insurance claims. California's Unfair Insurance Practices Act cited by plaintiff, which prohibits the practice of "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear," is inapplicable

14

1 because plaintiff has failed to demonstrate that defendant's liability for violations of the Unruh Act
2 is "reasonably clear." See Cal. Ins. Code § 790.03(h)(5). More fundamentally, however, there is no
3 private cause of action for insureds to bring a claim against an insurer for unfair practices in settling
4 claims under section 790.03 unless a final judicial determination of the insured's liability has been
5 first obtained. Moradi-Shalal v. Fireman's Fund Ins. Companies, 46 Cal.3d 287, 313 (1988); See
6 also, Chabner, 225 F.3d at 1049-51. Thus, plaintiff's standing fails on all accounts.

7 In sum, defendant's purported settlement terms may indeed be malicious and oppressive as
8 plaintiff asserts, but they are not actionable under the Unruh Act as currently plead by plaintiff.
9 Plaintiff's Unruh Act claim thus fails and defendant's motion for summary judgment as to plaintiff's
10 fifth claim for relief is GRANTED.

11 B.   Admissibility of Settlement Negotiations

12 Defendant argues that plaintiff's fourth, fifth, and sixth claims, for bad faith, Unruh Act
13 violations, and IIED, respectively, all depend on inadmissible statements made during the course of
14 settlement negotiations and are thus barred irrespective of their merits. Plaintiff's fourth cause of
15 action for bad faith alleges that defendant's settlement terms violate numerous provisions of
16 California's Unfair Insurance Practices Act. The sixth cause of action for IIED alleges that
17 defendant has acted outrageously, that the proposed settlement violates multiple sections of the
18 Unfair Insurance Practices Act and the Unruh Civil Rights Act, that defendant has violated the
19 standard of practice for insurers toward their insureds, and that defendant's management has a policy
20 of forcing its insureds to forego their rights. Plaintiff's fourth and sixth claims offer the settlement
21 negotiations as the basis for liability for bad faith and IIED.

22 Defendant argues that the claims related to settlement discussions are inadmissible under
23 Federal Rule of Evidence 408(a) and privileged by California Civil Code section 47(b). Because the
24 court finds that California Civil Code section 47(b) in itself bars plaintiff's fourth and sixth tort
25 claims based on settlement negotiations, it need not reach defendant's argument for inadmissibility
26 under the federal rules.

27 California Civil Code section 47(b) ("litigation privilege") provides that "[a] privileged
28 publication or broadcast is one made . . . in any (1) legislative or (2) judicial proceeding, . . . ."

15

1  Although originally restricted to defamation actions, the privilege is now given broad application
2  and immunizes defendants from tort liability for all torts except malicious prosecution. See <u>Silberg</u>
3  <u>v. Anderson</u>, 50 Cal. 3d 205, 211-12 (1990) (holding that the only tort claim that can be based on
4  litigation conduct or the filing of litigation is a claim for malicious prosecution). The privilege is
5  "intended to encourage parties to feel free to exercise their fundamental right of resort to the courts
6  for assistance in the resolution of their disputes, without being chilled from exercising this right by
7  the fear that they may subsequently be sued in a derivative tort action arising out of something said
8  or done in the context of the litigation." <u>Edwards v. Centex Real Estate Corp.</u>, 53 Cal. App. 4th 15,
9  29 (1997). Given the importance of the privilege, it is absolute in nature. <u>Silberg</u>, 50 Cal. 3d at 215;
10 <u>see also</u>, <u>Ribas v. Clark</u>, 38 Cal.3d 355, 364 (1985) (holding that the tortious nature and purpose of
11 defendant's actions does not negate privilege).

12 In terms of the types of "publications" that are statutorily protected, the California Supreme
13 Court has held that the privilege applies to "any communication (1) made in judicial or quasi-
14 judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the
15 objects of the litigation; and (4) that have some connection or logical relation to the action." <u>Silberg</u>,
16 50 Cal. 3d at 212. Further, the privilege applies to "any publication required or permitted by law in
17 the course of a judicial proceeding to achieve the objects of the litigation, even though the
18 publication is made outside the courtroom and no function of the court or its officers is involved."
19 <u>Id.</u>

20 Settlement negotiations have been found to fit within this privilege. <u>See, e.g.</u>, <u>Home Ins. Co.</u>
21 <u>v. Zurich Ins. Co.</u>, 96 Cal. App. 4th 17, 23 (2002) (finding that defendant's misrepresentation of
22 terms of insurance policy to induce settlement was absolutely privileged and not actionable in
23 derivative suit alleging intentional and negligent misrepresentation); <u>see also</u> <u>Rosenthal v. Irell &</u>
24 <u>Manella</u>, 135 Cal. App. 3d 121 (1982) (holding that plaintiff could not sustain action for intentional
25 infliction of emotional distress and other torts because the challenged communications that induced
26 settlement were privileged). Moreover, "[a]ny doubt as to whether the privilege applies is resolved
27 in favor of applying it." <u>Home Ins. Co.</u>, 96 Cal. App. 4th at 23.

28

1    It has even been found that "communications made in connection with litigation do not
2 necessarily fall outside the privilege simply because they are, or are alleged to be, fraudulent,
3 perjurious, unethical, or even illegal." Kashian v. Harriman, 98 Cal. App. 4th 892, 920 (2002). By
4 analogy to the instant action, even when viewed in the light most favorable to plaintiff, if the terms
5 of defendant's settlement agreement did constitute unfair insurance practices or misrepresent
6 plaintiff's future rights, plaintiff's tort actions would still be barred.

7    The California Supreme Court has recognized that "strict application of the privilege to
8 disallow derivative tort actions necessarily means some injuries will go uncompensated." Silberg,
9 50 Cal. 3d at 218. At the same time, however, it reasons that "the evils inherent in permitting
10 derivative tort actions based on communications during the trial of a previous action are . . . far more
11 destructive to the administration of justice than an occasional 'unfair' result." Id. at 213.

12   Thus, the court finds that plaintiff's fourth and sixth tort claims relating to settlement
13 negotiations is barred under the litigation privilege, and thus GRANTS defendant's motion for
14 judgment on the pleadings as to those claims.

## CONCLUSION

17   For the foregoing reasons, defendant's motion for partial summary judgment as to the first
18 and second claims is GRANTED. Defendant's motion for judgment on the pleadings as to the
19 fourth, fifth, and sixth claims is GRANTED.

20   As a result, all claims in the instant action have been eliminated except plaintiff's third claim
21 for breach of contract. As acknowledged by plaintiff, the granting of these motions has eliminated
22 all claims for general damages and punitive damages and only contract claims for back benefits
23 remain. The court notes that the deadline for completion of court-sponsored mediation has expired
24 and defendant's motion for extension of the deadline is still pending. See Docket No. 29.

25   The court further orders that the parties shall complete the selected ADR procedure within
26 sixty (60) days of the date of this order.

27   IT IS SO ORDERED.

28 Dated: January 8, 2009

MARILYN HALL PATEL
United States District Court Judge

17

## **ENDNOTES**

1. In the September 22, 2005 letter by which she opted plaintiff into reassessment, plaintiff's counsel Karen K. Wind indicated that plaintiff never received the June 21, 2005 notice of the RSA (a copy of which has been provided by defendant) because it was erroneously sent to plaintiff's last-known address rather than to plaintiff's counsel.

2. The CSA included provisions the RSA did not, namely, a third-party review of claim reassessment by insurance experts, to limit the discretion insurers have to interpret policy language and establishes a model policy that Unum and other disability insurers must adhere to in the state. See http://www.sec.gov/Archives/edgar/data/5513/000119312505195355/dex101.htm.

3. See http://maine.gov/pfr/insurance/unum/UNUM_RSA_Amendment.htm.

4. Upon stipulation and order the court, the parties agreed not to include the specific terms of the settlement agreement in the pleadings. Defendant noted elsewhere, however, that disabilities due to mental illness have a limited pay period up to twenty-four months under plaintiff's relevant policy. See Codiga Dec., Exh. 3.